## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RUBEN SILVA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-5214 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| RANDY PFISTER, ROB JEFFREYS, | ) | |
| WILLIAM BROWN, and BAREA | ) | |
| MIGGINS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ruben Silva, an Illinois state prisoner, has brought this suit challenging the conditions of his confinement under 42 U.S.C. § 1983. Silva asserts that his cell in the F housing unit ("F-House") at Stateville Correctional Center ("Stateville") was filthy and infested with pests in violation of his Eighth Amendment rights. He is suing Rob Jeffreys, the current Acting Director of the Illinois Department of Corrections ("IDOC");[1] Randy Pfister, the Warden of Stateville Correctional Center ("Stateville") during the relevant period; William Brown, a lieutenant at Stateville; and Barea Miggins, a correctional counselor at Stateville (collectively, "Defendants").[2] He seeks to hold Defendants responsible

---

[1]     John Baldwin was the Acting Director of IDOC at all times relevant to this suit; however, Rob Jeffreys has since assumed that role. *See* 9/25/19 Order, ECF No. 50. Because Silva sued the Acting Director in his official capacity, Jeffreys was substituted for Baldwin as a defendant in this case. *Id.* The other Defendants are sued in their individual capacities.

[2]     Although Silva originally named another IDOC employee, Major Watts, in his complaint (and discusses her in his response to Defendants' motion for summary judgment), it appears that Watts was never served. *See* Process Receipt and Return Form, ECF No. 16

for their roles in failing to address the conditions or otherwise allowing them to continue. Defendants have moved for summary judgment. For the following reasons, that motion is denied.

## I. <u>Background</u>[3]

### A. Conditions of Plaintiff's Confinement

Silva was incarcerated in Stateville's F-House from September 29, 2016, to November 30, 2016, when the housing unit was officially closed due to safety and operational hazards. Pl.'s L.R. 56.1 Stmt. Additional Material Facts ("PSOAF") ¶ 12, ECF No. 75; Defs.' L.R. 56.1 Stmt. Material Facts ("DSOF") ¶ 1, ECF No. 69. When Silva arrived at his F-House cell, he found feces and food smeared on the cell wall, mold in the damp area by the sink, cockroaches, spiders, gnats, and a

---

(noting that the summons was returned unexecuted because the United States Marshals were unable to locate Watts). To clarify the record, the Court *sua sponte* dismisses Silva's claims as to Watts under Rule 12(b)(5). *See* Fed. R. Civ. P. 12(b)(5). Given how far this case has progressed and the amount of time since the alleged constitutional violation, Silva's claims against Watts are dismissed with prejudice. *See Cardenas v. City of Chi.*, 646 F.3d 1001, 1005–08 (7th Cir. 2011) (explaining the factors a district court should consider when dismissing under Rule 12(b)(5), including prejudice to a defendant's ability to defend the suit and whether the statute of limitations has lapsed).

[3]     The following facts are undisputed or deemed admitted, unless otherwise noted. Because Defendants failed to respond to Plaintiff's Local Rule 56.1 Statement of Additional Material Facts, those facts are deemed admitted for the purposes of this motion. *See J & J Sports Prods., Inc. v. Banda*, No. 08 C 2570, 2009 WL 960098, at *2 (N.D. Ill. Apr. 8, 2009) (quoting *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)). Defendants also have waived any objection to the Court's consideration of the two exhibits Silva attached to his statement of additional facts. *See Cracco*, 559 F.3d at 632 ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."); *Cochran v. CSX Transp., Inc.*, 112 F. Supp. 2d 733, 740 (N.D. Ind. 2000) ("In general, a party must move to strike an affidavit that violates Federal Rule of Civil Procedure 56(e), and the failure to strike the exhibit results in a waiver of the objection in the absence of a gross miscarriage of justice.").

strong stale stench, "like [when] you . . . open up an old freezer." PSOAF ¶ 2; *see* Defs.' Ex. B ("Silva Dep.") at 36:4–39:18, ECF No. 69-2; Defs.' Ex. H ("Grievance Response") at 4, ECF No. 69-8. The mold was fuzzy and black in color (with some green and white patches); the cockroaches crawled on Silva's desk, bed, belongings, and body; and the smell made it hard for him to breathe. PSOAF ¶¶ 2, 4, 34. The cell also was cold because the window was broken—its glass was cracked, the latch did not work, and it had no seal. *Id.* ¶ 9. As a result, Silva had to stuff his blanket into the window to keep the cold air out. *Id.* Although this made the temperature tolerable during the day, at night, Silva would get cold because he could not use his blanket. *Id.* ¶ 10.

To make matters worse, Silva's cell was located right next to three large, lidless trash bins. *Id.* ¶ 7. The trash bags often were left overnight before they were taken out, and they sometimes burst open, spilling garbage. *Id.* The trash smelled and attracted birds and mice. *Id.* ¶ 8. The birds left droppings on the floor and rail outside Silva's cell, while the mice ran inside his cell. *Id.*

In addition, F-House was also extremely loud. *Id.* ¶¶ 11, 13. Silva could hear the other inmates screaming, banging their doors, and playing the radio; in his words, it was "pandemonium." Silva Dep. at 75:9–24. The noise was exacerbated by the "terrible acoustics" of F-House's panopticon design. PSOAF ¶¶ 11, 13.

**B.     Defendants' Responses to the Conditions**

As soon as Silva saw the state of his cell, he complained to Lieutenant Brown, who told Silva to "deal with it" and "clean it up." *Id.* ¶ 18. The parties have significant disagreements about the extent to which Silva could have, should have, and did clean his cell.

Defendants assert that inmates are responsible for cleaning their cells. DSOF ¶ 17. They state that cleaning supplies were provided to inmates on a weekly basis and additional supplies were provided on demand. *Id.* ¶¶ 17–18. Inmates could ask correctional staff to submit a work order so that the cells could be cleaned by custodial staff. DSOF ¶ 13. Stateville policy specified that such work orders could be placed to address minor violations of its safety and sanitation standards. *Id.* ¶ 12; Defs.' Ex. D, Stateville Institutional Directive on Safety and Sanitation Inspections at 3, ECF No. 69-4.

Defendants point out that Silva never explicitly asked anyone to submit a work order to clean his cell; nor did he ask Lieutenant Brown for cleaning supplies when he first arrived in his cell. *Id.* ¶¶ 15, 20. In Defendants' view, Silva was more interested in transferring to a clean cell than cleaning the cell to which he was assigned. *Id.* ¶ 21; *see* Silva Dep. at 61:19–62:1 ("Q: Were you able to clean it up, the spiderwebs? A: Yeah. But I wasn't trying to clean none of it up. I wanted out of that cell."). For example, Silva admitted that, when Lieutenant Brown first instructed him to clean his cell, Silva did not ask request cleaning supplies, despite not having any. Silva Dep. at 42:4–12 ("Q: Who did you ask for cleaning supplies?

4

A: Lieutenant Brown. Q: And what did he say? A: No, actually I didn't ask him for none. I just wanted to get out of that cell, honestly. Q: Did you ask anybody for cleaning supplies? A: No, I did not. I was trying to get out the cell. I wasn't trying to clean that up.").

Defendants also state that they employed an exterminator, Critter Ridder, which regularly serviced F-House, including on September 22, October 20, and November 16, 2016. DSOF ¶ 23. They assert that the trash was taken out and the floors were swept on a daily basis, while the floors were mopped at least once a week. *Id.* ¶¶ 24–26. Furthermore, IDOC policy provides for regular inspections, which then generate written safety and sanitation reports. *Id.* ¶ 9–10. Defendants highlight that the safety and sanitation report from October 2016—while Silva was assigned to F-House—notes that all areas were "clean and in good repair." *Id.* ¶ 11; Defs.' Ex. E, Stateville Safety & Sanitation Reports at 48; ECF No. 69-5.

Silva, on the other hand, maintains that he did try to clean the cell, and used his own face towel to wipe the feces off the walls. PSOAF ¶ 20. He also killed the majority of the gnats and cleared the spiderwebs. *Id.* ¶ 6; Silva Dep. at 61:19–62:1. But despite Silva's efforts, he could not clean off the mold, which was stuck to the wall. *See* Silva Dep. at 45:18–20 ("A: . . . You go over [the mold with the face towel] and you feel how rough it is and all scraped up, and nothing's coming off."). And he could not eliminate the cockroaches, which he continued to see every day. PSOAF ¶ 6. Nor could he do anything about the broken window, mice, birds, or noise.

5

Silva also disputes the availability of cleaning supplies. He states that he was never provided with a scrubber, a mop, a sponge, gloves, or any other cleaning implements. *Id.* ¶ 19. In fact, Silva asserts that, throughout his placement in F-House, he was only provided with a small cup of watered-down disinfectant on one or two occasions. *Id.* Silva also claims that he did not know that he could ask correctional staff to submit a work order for cleaning his cell, *id.* ¶ 23, and notes that the policy itself instructs only Safety and Sanitation Officers to submit work orders, Pl.'s Resp. Defs.' L.R. 56.1 Stmt. Material Facts ("Pl.'s Resp. DSOF") ¶ 12, ECF No. 76. Furthermore, Silva did not think that he needed to explicitly ask for cleaning supplies after complaining to multiple correctional officers and showing them the condition of his cell. PSOAF ¶ 23; Pl.'s Resp. DSOF ¶¶ 15, 18, 20.

Silva also points out that—while the October 2016 safety and sanitation report states that F-House was clean and in good repair—the reports for January, February, March, April, May, and August of that year all note that F-House was not free of insects, rodents, birds, and other animals. PSOAF ¶ 14. The July and August reports also noted that the trash bins needed to be lined and covered. *Id.* ¶ 15; *see* Stateville Safety & Sanitation Reports at 18. And Defendants did not produce safety and sanitation reports for September or November 2016. Pl.'s Resp. DSOF ¶ 11.

Furthermore, notwithstanding IDOC's contract with Critter Ridder, Silva never saw an exterminator come to F-House, and no one sprayed for cockroaches or other pests in Silva's cell. *Id.* ¶ 5. And, in his experience, although the trash

6

may have been taken out once per twenty-four-hour period, it was often left in the bins overnight. *Id.* ¶ 7. Finally, he asserts that the sweeping and mopping of the F-House hallways did not address the bird droppings that collected on the railing outside his cell. Silva Dep. at 71:1–72:3.

The parties agree that on October 10, 2016, Silva submitted a grievance describing the conditions of his cell and complaining that Brown had "knowingly and deliberately subjected [Silva] to inhumane living conditions." Grievance Response at 3. Nine days later, Counselor Miggins responded to Silva's grievance, stating: "If mold is present, you should contact unit staff so a work order can be submitted. Every effort is made to ensure wildlife does not enter, however from time to time this may occur. The unit is sprayed monthly for bugs." *Id.* Silva notes that the grievance response did not explain that he must explicitly ask correctional staff to submit a work order. Pl.'s Resp. DSOF ¶ 14.

Silva later saw Miggins when she was making her rounds after he had submitted his grievance. PSOAF ¶ 26. But although he showed her the condition of his cell, her only response was to tell Silva, "stop coming to seg[regation]." *Id.* Miggins did not advise Silva to submit a work order via correctional staff, she did not submit a work order for him, she did not advise him to ask for cleaning supplies, and she did not arrange for cleaning supplies to be sent to him.

On December 9, 2016, Warden Pfister signed Silva's grievance, indicating that he concurred with Miggins's response. Grievance Response at 2. And in May

2017, the Acting Director of IDOC signed the administrative review board's order denying Silva's appeal. *Id.* at 1.

In addition to Silva's grievance, Pfister received the monthly safety and sanitation reports, which described the conditions at Stateville, in general, and F-House, in particular. PSOAF ¶¶ 16–17. Silva also submits that in 2013, the John Howard Association of Illinois—an independent prison monitoring association— published a monitoring report on Stateville that was "reviewed and fact-checked" by "Stateville and IDOC administrators." Pl.'s Ex. 1, 2013 John Howard Association Report at 2 n.1, ECF No. 75-1. The monitoring report stated that "[i]nmate reports of bird, rodent, cockroach, and spider infestations [at Stateville] were common and credible," and that "Unit F [was] in particularly poor condition, [with] peeling paint, water leaks, and mold" as well as "insufficient cleaning supplies." 2013 John Howard Association Report at 12.

## C. Plaintiff's Injuries

One week after Silva was placed in F-House, he started suffering from headaches, trouble breathing, stomach pain, and diarrhea. PSOAF ¶ 31. The smell in Silva's cell also made it difficult to breathe. *Id.* ¶ 34. Silva's headaches were frequent, and he had not experienced them prior to his time at F-House. *Id.* ¶ 33. The headaches resolved after he left. *Id.* ¶ 33.

Silva suffered from diarrhea on two occasions, each of which lasted for multiple days. *Id.* ¶ 32. He sought treatment for the headaches and the diarrhea, and medical personnel gave him medication for each ailment. *Id.* ¶ 33; DSOF ¶ 28;

Silva Dep. at 115:22–116:14. Additionally, Silva experienced stress and anxiety from the stench, the pest infestations, the mold, and the perpetual noise, and he saw a mental health provider to learn how to cope with it. PSOAF ¶ 35–36.

### D.    Procedural History

Plaintiff filed his complaint *pro se* on July 27, 2018, asserting that each Defendant violated his constitutional rights by subjecting him to cruel and unusual conditions of confinement. The Court conducted an initial screening, *see* 28 U.S.C. § 1915A, and directed Defendants to respond to the suit. The Court appointed counsel, the parties took discovery, and Defendants now move for summary judgment.

## II.    Legal Standard

Summary judgment is appropriate where the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that ultimate burden, the nonmoving party must establish "that a reasonable jury could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

On summary judgment, a "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *McCottrell v. White*, 933 F.3d 651, 657–58 (7th Cir. 2019) (cleaned up); *see also Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### III. <u>Analysis</u>

The conditions of confinement in a jail or prison violate the Eighth Amendment's prohibition on cruel and unusual punishment when "(1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities, and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (cleaned up) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). An official is deliberately indifferent if he or she acted or failed to act despite knowledge of a substantial risk to inmate health or safety. *Id.* at 1008. A § 1983 plaintiff must also demonstrate injury and causation; in other words, he must "show that he suffered some cognizable harm from the overall lack of a sanitary environment, and that the [defendants'] deliberate indifference caused that harm." *Id.* at 1006.

Here, Defendants argue that they are entitled to summary judgment because Silva cannot demonstrate a genuine issue of material fact as to any of these elements. The Court will address each in turn.

## A.    Objectively Serious Condition of Confinement

"Incarcerated persons are entitled to confinement under humane conditions which provide for their 'basic human needs.'" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Seventh Circuit has held that "[a] lack of heat, clothing, or sanitation can violate the Eighth Amendment." *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). "Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so. This is true when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need." *Id.* Furthermore, "[a]n adverse condition of confinement, if endured over a significant time, can become an Eighth Amendment violation even if it would not be impermissible if it were only a short-term problem." *Gray*, 826 F.3d at 1005 (citing *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997)".

As particularly relevant here, the Seventh Circuit has recognized that "a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation." *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (citing *Antonelli v. Sheahan,* 81 F.3d 1422, 1431 (7th Cir. 1996)). And in *Gray v. Hardy*, the Seventh

Circuit considered conditions in Stateville's F-House that are nearly identical to the ones endured by Silva, finding that the "myriad infestations" and "lack of access to adequate cleaning supplies," when taken together, deprived the plaintiff of "the basic human need of rudimentary sanitation in violation of the Eighth Amendment." 826 F.3d at 1006. The Seventh Circuit described the conditions as follows:

> [The plaintiff] sees cockroaches at least every other day, and sometimes as often as every few minutes. Birds fly and nest all over the prison, leaving their droppings on the floors and walls . . . . [Prison officials] wash the floors every other day, but the dander from vermin and the bird feces remain in difficult-to-reach places despite these efforts. Mice are often in Gray's cell, where they eat his food. The cell house is also infested with ants, spiders, flies, gnats, moths, and mosquitos. A big source of the problem lies in the prison's failure to fix broken windows and other holes in the wall, through which the birds and other pests re-enter as soon as they are removed . . . . A pest control company services the prison once a month, but Gray asserts that its efforts are ineffective, and the company does nothing about the birds . . . . The prison's policies regulating cleaning supplies contribute to the unsanitary conditions that prevail. Gray receives only one towel, which is replaced every eight months; he also gets some watered-down disinfectant spray. He does not have access to mops, brooms, or buckets . . . . [When Gray submitted a grievance, the response] acknowledged that wildlife enter the prison and it said that the prison was making "[e]very effort" to keep it out. In addition, the letter pointed out that Gray's cellblock was sprayed for bugs once a month and that the prison distributed cleaning supplies when requested.

*Id.* at 1003–04. Gray complained that the conditions exacerbated his asthma and caused a rash to develop on his skin. *Id.*

Defendants attempt to differentiate this case from *Gray*, citing *Cobian v. McLaughlin* for the proposition that there is no constitutional violation where an inmate can clean his own cell. 804 F. App'x 398 (7th Cir. 2020). But *Cobian* is distinguishable for two reasons. First, in *Cobian*, the plaintiff protested only that the cell's surfaces were initially covered in another inmate's feces. *Id.* at 398. Cobian did not complain about a pest infestation or other unsanitary conditions. Second, and more significantly, "[a]fter Cobian notified prison staff about the cell's condition, he received cleaning supplies—bleach, disinfectant, rags, and gloves." *Id.* at 398–99. "With them, [Cobian] cleaned up all the feces except for remnants stuck in two areas: an enclosed section of plexiglass on the cell door (above the food port, which he fully cleaned) and behind the window screen near the foot of his bed." *Id.* at 399. Cobian filed suit because, despite his continued complaints, wind coming in through his broken window "blew dry fecal matter onto Cobian's feet at night, which he had to wash off in his sink in the mornings." *Id.* By contrast, here, it is undisputed that Silva was never provided with proper cleaning supplies, like bleach or gloves, and that the face towel he used to wipe up the feces was not effective against the mold or other conditions in his cell.

This case is also distinguishable from *Sain v. Wood*, where "during [the plaintiff's] approximately six-year confinement in the old unit, he often saw 'several' cockroaches crawling in his cell." 512 F.3d 886, 894 (7th Cir. 2008). But in that case, the plaintiff conceded that "an exterminator regularly visited his cell—every month or month and a half—and also would come in response to Mr.

Sain's complaints." *Id.* By contrast, here, Silva states that no exterminator ever visited his cell, and he never saw an exterminator treat F-House in general. *See* PSOAF ¶ 5. And, "perhaps most notable, Stateville's sign-in sheets for Critter Ridder show that, although it visited each cell house once a month," the exterminators did not necessarily visit any individual cells. *See Hardy v. Godinez*, No. 12 C 6033, 2017 WL 2569605, at \*10 (N.D. Ill. June 12, 2017); *id.* at \*4 (distinguishing between sign-in entries stating that Critter Ridder visited F-House in general and "F Unit, all cells," which indicated that individual cells were treated); Defs.' Ex. F, Contractual Service Employee Sign In Sheet for Critter Ridder, Inc., ECF No. 69-6.

Because the facts construed in the light most favorable to Silva present conditions that are practically identical to those found unconstitutional in *Gray v. Hardy*, Defendants have not demonstrated that they are entitled to judgment as a matter of law on the ground that the conditions of Silva's confinement were not objectively serious.

## B. Deliberate Indifference

To survive summary judgment, Silva also must show that Defendants were deliberately indifferent to a substantial risk to his health or safety. *See Gray*, 826 F.3d at 1008. This means that Defendants not only must have been aware of facts from which they could infer that a substantial risk of serious harm existed, they also must have drawn that inference. *Id.* That said, Silva does not bear the burden of proving that Defendants "acted or failed to act believing that harm actually

14

would befall" him; rather, "it is enough to show that [each Defendant] 'acted or failed to act despite his knowledge of a substantial risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 842.). The Seventh Circuit has held that, where pest infestations and otherwise systemic unsanitary conditions are at issue, "the risk of both physical and psychological harm is obvious—children are taught the importance of washing their hands before kindergarten, and the repulsive nature of cockroaches and mice is hardly subject to dispute." *Id.* at 1009.

## 1. **Warden Pfister and Acting Director Jeffreys**

Defendants Jeffreys and Pfister argue that Silva cannot show that they, as supervisory officials, were deliberately indifferent to the conditions in his cell. Silva counters that "requests for relief which have fallen on deaf ears may evidence deliberate indifference." *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997). And signed grievance responses are sufficient to create a triable issue of fact regarding Defendants' knowledge. *See Gray*, 826 F.3d at 1008 (noting that "an inmate's letters to prison administrators may establish a basis for § 1983 liability" where "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety" (cleaned up). Here, both Pfister and the current Acting Director signed Silva's grievance.

Furthermore, where the evidence demonstrates a systemic problem, senior officials like the Warden of Stateville and the Acting Director of IDOC could be expected to have "personal responsibility" for resolving the situation. *See*

15

*Antonelli*, 81 F.3d at 1428–29. "Although no bright-line test determines when a condition is 'potentially systemic' rather than 'clearly localized' . . . the Seventh Circuit has indicated that . . . pest infestations . . . are unlikely to affect only one inmate in isolation." *Britton v. Williams*, No. 16 C 11180, 2017 WL 4410117, at *4 (N.D. Ill. Oct. 4, 2017) (citing *Antonelli*, 81 F.3d at 1427–29; *Smith v. Dart*, 803 F.3d 304, 312–13 (7th Cir. 2015)). And courts have also "inferred the existence of systemic conditions based upon allegations of generally unsanitary conditions." *Id.*

Here, the safety and sanitation reports regularly indicated that F-House was not free of insects, rodents, birds, and other animals. PSOAF ¶ 14. And in 2013, a monitoring report that had been "reviewed and fact-checked" by "Stateville and IDOC administrators" stated that "[i]nmate reports of bird, rodent, cockroach, and spider infestations [at Stateville] were common and credible," that "Unit F [was] in particularly poor condition, [with] peeling paint, water leaks, and mold," and that the cleaning supplies available to inmates were "insufficient." 2013 John Howard Association Report at 2 n.1, 13.

Defendants Pfister and Jeffreys respond that even prison officials who had actual knowledge of an excessive risk to the health or safety of an individual are "free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *See Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (citing *Farmer*, 511 U.S. at 847). But courts in this circuit have held that a jury

16

should determine whether the steps taken by individuals in Defendants' positions were, in fact, reasonable. *See Santiago v. Rabideau*, No. 15 C 1856, 2019 WL 1747361, at *13 (N.D. Ill. Apr. 18, 2019). And "[k]nowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *Gray*, 826 F.3d at 1009. Thus, the question of Pfister and Jeffreys's deliberate indifference is one for a trier of fact.

### 2. Lieutenant Brown and Counselor Miggins

Lieutenant Brown and Counselor Miggins argue that Silva has no evidence from which to infer that they were deliberately indifferent to his plight. Brown and Miggins emphasize that they "do not have a free-floating obligation to put things to rights" when an inmate complains, and "no prisoner is entitled to insist that one employee do another's job." *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). They each assert that they acted reasonably within the strictures of their job descriptions and thus did not act with deliberate indifference.

Miggins further argues that in her capacity as a correctional counselor, she was responsible for "attempt[ing] to resolve inmate grievances by contacting the relevant staff or reviewing relevant documents." Defs.' Ex. J, Miggins Decl. ¶ 3, ECF No. 69-10. But she was *not* personally responsible for assigning inmates to cells, changing inmate cell assignments, cleaning cells, or maintenance and repairs. *Id.* ¶ 6. Silva, for his part, does not challenge that assertion, but contends that Miggins *was* responsible for identifying the person who was responsible for remedying the conditions and bringing it to that person's attention. *See* Silva Dep.

17

at 50:5–9 ("Q: What should Miss Miggins have done? A: Being the counselor, she could have, you know, brought it to whoever's responsible's attention. That's what your counselor's for. You know, so she's like your voice . . . . [E]verybody got different responsibilities. So she knew or should have know [sic] who is who . . . ."). Yet, Miggins's only response to Silva's grievance was to tell him he should "contact unit staff so a work order can be submitted," without clarifying that Silva needed to explicitly request a work order (as opposed to showing staff the state of his cell, which, as he indicated in his grievance, he had already done). *See* Pl.'s Resp. DSOF ¶ 14; Grievance Response at 4 ("I made staff aware of these conditions."). And when Silva showed Miggins the state of his cell when she was on her rounds, her only response was to tell him to "stop coming to seg[regation]." PSOAF ¶ 26.

Similarly, Brown protests that he was not personally responsible for inmates' housing unit or cell assignments. Defs.' Ex. I, Brown Decl. ¶ 10, ECF No. 69-9. Brown maintains that he acted reasonably when he told Silva to clean his cell. But this argument is premised on Brown's claim Silva could, in fact, clean his cell after Brown instructed him to. *See id.* ¶¶ 4, 5 (stating that cleaning supplies were available to inmates on a weekly basis, as well as on demand). As discussed above, Silva has presented evidence that the cleaning supplies on hand were not adequate to address the condition of his cell. Although Brown emphasizes that Silva did not explicitly ask him to provide cleaning supplies or to submit a work order, Miggins's grievance response stated that unit staff were responsible for submitting work orders, and Brown's affidavit states that inmates could

18

request additional cleaning supplies. *See* Grievance Response at 3; Brown Decl. ¶ 5. Brown does not specify whether his responsibilities included submitting work orders or arranging for additional cleaning supplies. As such, a trier of fact could conclude that Brown had a responsibility to either submit a work order or arrange for Silva to receive cleaning supplies (or both) after seeing the condition of Silva's cell.

Thus, there are genuine issues of material fact as to whether Miggins and Brown were deliberately indifferent to Silva's conditions of confinement.

## C. Causation and Injury

Finally, "[i]n order to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.'" *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)). In a conditions-of-confinement case like this one, Silva must tie a cognizable injury to "the overall lack of a sanitary environment" and Defendants' indifference. *See Gray*, 826 F.3d at 1006. An injury is cognizable if "a reasonable doctor or patient would find [it] important and worthy of comment or treatment," the medical condition "significantly affects an individual's daily activities," or the inmate is in "chronic and substantial pain." *Id.* (cleaned up).

Here, Silva saw a doctor and was given medication for his headaches and diarrhea. PSOAF ¶¶ 31–33; DSOF ¶ 28. Silva also says that he suffered from trouble breathing, although he did not see a physician for that specific ailment.

19

PSOAF ¶¶ 31–34. Nonetheless, "[b]earing in mind that this is a prison-conditions case, not a case about inadequate medical treatment, this is enough to show some physical injury." *See Gray*, 826 F.3d at 1006 (holding so where the plaintiff's asthma worsened and he developed a skin condition after exposure to the conditions he complained of).

Furthermore, although the Prison Litigation Reform Act bars recovery of compensatory damages for mental and emotional injuries, 42 U.S.C. § 1997e(e), an inmate may recover nominal or punitive damages for such harms, *Gray*, 826 F.3d at 1007. Here, Silva sought out mental health treatment to deal with the stress of the infestations, the mold, the stench, and the cacophony of F-House's panopticon design. PSOAF ¶¶ 35–36. And the Seventh Circuit has held that "[t]he potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Gray*, 826 F.3d at 1008 (quoting *Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012)). Thus, Silva has submitted sufficient evidence that he suffered a cognizable injury.

Defendants also argue that Silva cannot establish a causal link between his injuries and his conditions of confinement because he has not retained a medical expert. But Silva can rely on the timing of his symptoms (which did not begin until after his placement in F-House, and which resolved after he left, *see* PSOAF ¶¶ 31–36), as well as the "common-sense link" between mold, cold, insect dander, and the like, and compromised breathing, headaches, and diarrhea. *See Gray*, 826 F.3d at 1007; *see also Gomez v. Palmer*, No. 11 C 1793, 2016 WL 212800, at *8

(N.D. Ill. Jan. 19, 2016) (noting that "a layperson may testify to the causation of medical symptoms of injuries where such causation is within the usual and ordinary experience of the average person").

Accordingly, Silva's summary judgment materials "present triable issues of fact for a jury, which must determine the degree of both physical and psychological harm he suffered as a result of the infestations and dirt," the mold, and the noise. *See id.*

## CONCLUSION

For the above-stated reasons, Silva has demonstrated a genuine issue of material fact relating to each element that he must prove. As such, Defendants' motion for summary judgment is denied.

**IT IS SO ORDERED.**                    **ENTERED: 3/23/21**

_____

**JOHN Z. LEE**
**United States District Judge**